IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 13, 2018

## CHRIS JONES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 08-05720     Chris Craft, Judge

_____

### No. W2017-00405-CCA-R3-PC

_____

The Petitioner, Chris Jones, appeals the dismissal of his petition for post-conviction relief upon the post-conviction court's determination that it was filed outside the statute of limitations and that the Petitioner failed to prove that his mental incompetence required its tolling. After review, we affirm the dismissal of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined

Paul K. Guibao and Ernest Beasley, Memphis, Tennessee, for the appellant, Chris Jones.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The Petitioner was convicted of second degree murder, attempted second degree murder, attempted voluntary manslaughter, using a firearm during the commission of a dangerous felony, and possession of a firearm where alcoholic beverages are served, and

he was sentenced to twenty-three years[1] in the Department of Correction. See State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *1 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011). This court affirmed the trial court's judgments on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. Id.

The facts giving rise to the Petitioner's convictions were summarized by this court on direct appeal as follows:

This case arises from a parking dispute which ultimately resulted in the death of Donald Munsey at the Windjammer karaoke bar in the early morning hours of March 14, 2008. The [Petitioner], a Shelby County Sheriff's Deputy at that time, began the evening of March 13, 2008, at T.J. Mulligan's sports bar, where he ordered eight beers and watched a basketball game. At halftime of the game, the [Petitioner] spoke to fellow Shelby County Sheriff's Deputy Lawrence Bowling. The [Petitioner] told Deputy Bowling that his divorce was recently finalized and that his ex-wife was keeping his children away from him and turning them against him. Deputy Bowling testified that he could tell the [Petitioner] had been drinking. The [Petitioner] also spoke with Cathey Lampley and her friend Mary while he was at T.J. Mulligan's. The [Petitioner] bought Mary a drink, and when Ms. Lampley and Mary decided to go to the Windjammer, the [Petitioner] asked if he could follow them. They agreed and all three left T.J. Mulligan's. Ms. Lampley testified that the [Petitioner] was not intoxicated when she spoke to him at T.J. Mulligan's. The bartender, Jason Koski, also testified that the [Petitioner] was not intoxicated when he closed his bar tab. However, Mr. Koski admitted that at the time of trial, T.J. Mulligan's was involved in a civil suit for allegedly overselling alcohol to the [Petitioner].

*A. The [Petitioner]'s confrontation with Justin Smith*

Justin Smith testified that he was sitting in his truck when the [Petitioner]'s truck "[j]ust came flying in around the corner . . . [and] almost hit [his] truck in parking." Mr. Smith further testified that he felt he would not be able to get his truck out of the parking spot because of the way the [Petitioner] had parked his truck. However, Mr. Smith waited until

---

[1]We rely on the Petitioner's statement in his post-conviction petition that he was sentenced to twenty-three years, as neither the technical record nor this court's opinion on direct appeal indicate the sentence he received.

the [Petitioner] had gone inside the bar to speak to him about his truck. Once inside, the [Petitioner] sat down with Ms. Lampley and Mary at a table near the front door and ordered a beer. Mr. Smith then approached the [Petitioner] to discuss how the two trucks were parked. The testimony at trial presented several conflicting versions of exactly what was said during this conversation.

Kimberly Guest, the waitress working at Windjammer that night, testified that Mr. Smith asked the [Petitioner] if it was his truck outside and "if he could possibly move it because . . . the trucks were close and [he] didn't want to hit his truck." Ms. Guest testified that "there was no indication that there was any kind of problem," there was no physical contact between the two men, and she did not hear any "threatening language." Stephanie Ravinuthala, a patron at the bar that night, testified that Mr. Smith asked the [Petitioner] if he drove a gray truck and told the [Petitioner] that he was "parked like three inches from [Mr. Smith's] bumper and [Mr. Smith could not] get out." Ms. Ravinuthala also testified that Mr. Smith did not appear to be belligerent and that she did not recall Mr. Smith cursing at the [Petitioner].

Mr. Smith testified that when he asked the [Petitioner] to move his truck, the [Petitioner] responded by saying "f--k you . . . I'm not moving it." On cross-examination, Mr. Smith repeatedly denied threatening or being aggressive with the [Petitioner] but admitted that after the [Petitioner] told him "f--k you," he was "rude" toward the [Petitioner]. However, Ms. Lampley testified that Mr. Smith approached the [Petitioner] intoxicated, "very loud, very arrogant" before asking the [Petitioner] "if that was his f----g truck outside." Ms. Lampley testified that the [Petitioner] was very calm during this exchange and told Mr. Smith he would move his truck when Mr. Smith was ready to leave.

At some point after their conversation, both Mr. Smith and the [Petitioner] went outside. Gary Miller was working at the front door, checking IDs, that night and testified that he overheard the two men "discussing the way the [trucks] were parked." Mr. Miller also testified that at some point two or three other men joined the conversation. According to Mr. Miller, the [Petitioner] asked the men "did they not realize that he was a police officer by the tag that was on the truck." Mr. Miller further testified that there was no physical contact between the [Petitioner] and any of the three or four people with him. Mr. Smith testified that he went outside with the [Petitioner] because the [Petitioner]

"wanted to show me his license plate." The [Petitioner] told Mr. Smith that "he was a cop and he had the tag on his truck." Mr. Smith testified that after their conversation outside, he did not speak to the [Petitioner] again that evening.

Mr. Smith's friend, William Bobbitt, testified that he was near the front door when Mr. Smith and the [Petitioner] went to look at the trucks. On their way back to the front door, Mr. Bobbitt overheard the [Petitioner] say that he was not going to move his truck and that Mr. Smith should look at his license plate. Someone asked the [Petitioner] what he meant by this, and he replied that he was a police officer. Mr. Bobbitt testified that the [Petitioner] spoke with an aggressive tone but that there was no physical contact between the [Petitioner] and anyone outside. Mr. Bobbitt further testified that everyone went back inside after Mr. Munsey stepped outside and told them to come in.

Ms. Lampley testified that before the [Petitioner] and Mr. Smith went outside, Mr. Smith made a phone call and a short time later "[a]bout [ten] guys around the age of 21 to 25 showed up" and were looking at the [Petitioner]. Ms. Lampley testified that the [Petitioner] looked scared when he came back inside. Ms. Lampley testified that she felt threatened because this group of men continued to stare at the [Petitioner] and her. However, on cross[-]examination Ms. Lampley admitted that she was "making some jump here . . . that Mr. Smith called people and that as a result of those calls, people arrived."

*B. The [Petitioner]'s confrontation with David Eagan*

After the [Petitioner] reentered the bar, David Eagan approached him to discuss the parking situation. Mr. Eagan testified that he was too intoxicated to remember everything that happened that night. However, Mr. Eagan testified that he spoke to the [Petitioner] because the [Petitioner] "was a little rowdy" and that he wanted "to make sure that . . . everything was okay" between the [Petitioner] and Mr. Smith. Mr. Eagan testified that he "asked [the Petitioner] to move his truck and . . . just to calm down and everything was going to be okay." Mr. Eagan testified that he could not remember anything else about his conversation with the [Petitioner]. Mr. Eagan repeatedly denied threatening the [Petitioner] or having a physical altercation with him. Mr. Eagan did admit on cross examination that he had described the conversation between Mr. Smith and the [Petitioner] as "an altercation."

- 4 -

Several witnesses saw the confrontation between the [Petitioner] and Mr. Eagan inside the bar. Ms. Ravinuthala testified that she saw Mr. Eagan "lean[ ] down into [the Petitioner's] face" when he spoke to him and that the [Petitioner] responded by standing up and getting in Mr. Eagan's face. Joe Reynolds was working at the bar that night and testified that he saw the [Petitioner] and Mr. Eagan "talking about the parking place or something." Mr. Reynolds testified that the [Petitioner] had an ink pen in his hand and was "gripping [it] so tight that his knuckles were white." Mr. Reynolds decided to get Mr. Eagan to move away from the [Petitioner]. After sep[a]rating the two, Mr. Reynolds spoke with the [Petitioner]. The [Petitioner] told Mr. Reynolds "I'm a mother-----g Shelby County Sheriff['s] Deputy and I [came] in here to drink my f-----g beer and I want to be left alone." Mr. Reynolds told him that everything was okay and to just have a drink and enjoy himself. Mr. Reynolds then went back to work and left the [Petitioner] near the front door.

Several witnesses testified that after his conversation with Mr. Reynolds, the [Petitioner] stood by a table and a stared at the bar where Mr. Eagan and Mr. Smith were standing. Pamela Flynn, her husband, John Flynn, and their friend, Ms. Ravinuthala, were seated at the table. All three testified that the [Petitioner] was "actually standing almost on top" of Ms. Ravinuthala just staring towards the bar. At one point, Ms. Guest asked the [Petitioner] to move so Ms. Ravinuthala would feel more comfortable.

Mr. Reynolds approached the [Petitioner] and had a second conversation with him as the [Petitioner] stared at Mr. Eagan and Mr. Smith. Mr. Reynolds asked the [Petitioner] if he was okay, and the [Petitioner] pointed at Mr. Eagan and said, "I'm going to kill that motherf-----r righter there." Then the [Petitioner] pointed at Mr. Smith and said, "I'm fixing to kill his punk ass buddy and if any of his buddies over there even approach me, I'm going to kill all of them motherf-----s." Mr. Reynolds told the [Petitioner] to calm down, and the [Petitioner] responded by saying, "I've lost my wife and I've lost my family and I've lost my home and I got nothing else to lose." Ms. Flynn and Ms. Ravinuthala both overheard the [Petitioner] threaten to kill Mr. Smith and Mr. Eagan. Mr. Flynn overheard the [Petitioner] say he had nothing left to lose. Ms. Flynn testified that the [Petitioner] was clenching and unclenching his fists as he spoke with Mr. Reynolds. Mr. Flynn also testified that the [Petitioner] seemed very upset as he spoke with Mr. Reynolds. Mr. Reynolds again told the [Petitioner] to calm down but was called away to the office to answer a telephone call.

## C. The shooting

After Mr. Reynolds left the [Petitioner], Mr. Eagan paid his bar tab and began to walk toward the door. The [Petitioner] pulled out a gun, ran toward Mr. Eagan, grabbed Mr. Eagan by his shirt collar, and put a gun to his head. Mr. Eagan testified that the [Petitioner] said, "I'm going to kill you. I have nothing to lose."

The testimony at trial presented conflicting accounts of what happened next. Mr. Flynn testified that the bar was crowded that night and there were lots of people standing near the [Petitioner] and Mr. Eagan. Ms. Guest testified that she was near the [Petitioner] and overheard him say, "who's the tough guy now, motherf----r . . . the tough guy's got the gun." Ms. Guest further testified that she asked the [Petitioner] "please don't do this" when Mr. Munsey grabbed the [Petitioner] from behind. According to Ms. Guest, Mr. Eagan then fainted, knocking down the [Petitioner], Mr. Munsey, and Ms. Guest as he fell to the floor. Ms. Guest then heard two or three gunshots and saw that Mr. Munsey had been shot in the neck.

Mr. Bobbitt testified that he and Mr. Munsey were in the kitchen when they saw the [Petitioner] grab Mr. Eagan. Mr. Bobbitt also testified that he did not see a gun from where they were standing. Mr. Bobbitt and Mr. Munsey then charged toward the [Petitioner] and tackled him. All four men fell to the ground; however, Mr. Bobbitt testified that while the men were on the ground, no one hit the [Petitioner]. Mr. Bobbitt also testified that Ms. Guest was not involved at all. Mr. Bobbitt then heard two gunshots and ran out of the building. Mr. Smith similarly testified that Mr. Bobbitt and Mr. Munsey tackled the [Petitioner]. After hearing the first gunshot, Mr. Smith ran out the front door, and out of the corner of his eye, he saw the [Petitioner] aiming the gun at him. Mr. Smith was then shot in the buttock. Mr. Eagan testified that he did not remember anything after he fell to the ground.

Mr. Flynn and Ms. Ravinuthala both testified that they saw Mr. Munsey tackle the [Petitioner] and that both men and Mr. Eagan fell to the floor. Ms. Ravinuthala testified that she saw the [Petitioner] and Mr. Munsey "wrestle" on the ground for a minute. The [Petitioner] then pulled himself up, aimed his gun at Mr. Munsey's head, and fired it. Next, the [Petitioner] turned and aimed his gun at Mr. Smith before firing a second time. Mr. Miller had left the bar earlier to run an errand, and when he returned, he discovered Mr. Munsey's body lying on the floor with Ms.

Guest kneeling next to him. Mr. Miller saw the [Petitioner] seated by the front door. He told the [Petitioner] to remove the magazine from his gun and to lay them on a table, and the [Petitioner] complied.

### D. The police investigation

Officer Zane Lewis of the Memphis Police Department (MPD) was one of the first officers to arrive at the bar. Officer Lewis testified that the [Petitioner] surrendered to him and his partner, and that he took the [Petitioner]'s gun into custody. Officer Jeffery Klein of the MPD testified that the [Petitioner] was placed in his squad car after he was taken into custody. Officer Klein testified that during the time between his initial arrest and when the [Petitioner] was brought to the police station, the [Petitioner] repeatedly talked about his children and his recent divorce. Officer Klein testified that the [Petitioner] never said he was attempting to arrest Mr. Eagan or that he was threatened by Mr. Eagan or Mr. Smith. Instead, the [Petitioner] only said he had to shoot Mr. Munsey to save his life.

Lieutenant Don Crowe of the MPD Felony Response Bureau testified that he was in charge of the investigation. Lieutenant Crowe testified that two spent shell casings were found at the crime scene, that the [Petitioner]'s gun can hold up to nine rounds, and when the gun was taken into police custody, there were seven rounds remaining in the magazine. Lieutenant Crowe also testified that when the [Petitioner] was brought to the police station, photographs were taken of injuries to his chin, left hand, and left elbow along with photographs of a red mark on his chest and redness on his right ear.

Dr. Miguel Laboy testified that Mr. Munsey died from an intermediate range gunshot wound to his neck. Dr. Laboy further testified that the fatal gunshot could have been fired from a few inches up to two feet away from Mr. Munsey. Dr. Laboy also testified that Mr. Munsey had tested positive for methamphetamine at the time of his death and that methamphetamine can make a person feel euphoric, aggressive, or violent.

### E. The [Petitioner]'s testimony

The [Petitioner]'s testimony presented a radically different description of the events that led up to the shooting. The [Petitioner] testified that there was nothing wrong with the way he had parked at

Windjammer and that Mr. Smith could have easily gotten his truck out of the parking space. However, according to the [Petitioner], once he was inside the bar, Mr. Smith came up to him and said, "are you the asshole driving the gray truck . . . you need to move your f----g truck." The [Petitioner] testified that he told Mr. Smith that he did not want any trouble and that they should go outside and they would see Mr. Smith was not blocked in. According to the [Petitioner], Mr. Smith then responded by saying "this is my f-----g bar . . . you don't f-----g belong here . . . you need to f-----g leave."

The [Petitioner] further testified that when he went outside, Mr. Smith had about seven or eight young men waiting on him. According to the [Petitioner], as he tried to reenter the bar, Mr. Eagan said to him "you don't realize who you're f-----g with motherf----r" and "when you get ready to leave, we're going to take you out back and we're going to kill you." The [Petitioner] testified that he then told the men they had way too much to drink, that he was not looking to start any trouble, and "y'all have already seen the tags on my truck." Then, according to the [Petitioner], as they reentered the bar Mr. Eagan said, "do you think cause you're a cop that we won't kill you . . . we don't give a f--k that you're a cop." The [Petitioner] testified that he asked Mr. Reynolds to throw Mr. Eagan and Mr. Smith out but that Mr. Reynolds "just stared at me like I hit him in the head with a hammer." According to the [Petitioner], Mr. Eagan continued m to threaten him after he sat back down saying, "I'm looking at a dead motherf----r and that motherf----r is you." The [Petitioner] testified that later, Mr. Smith walked up to him while talking on a cell phone and told him, "they're going to be waiting out front for you when you try to leave and they're going to kill [you] . . . you're dead."

According to the [Petitioner], he then attempted to ask Mr. Reynolds for help again. The [Petitioner] claims he asked Mr. Reynolds to call 911 and told him, "I've got men that I don't even know saying they're going to kill me . . . obviously they must think I have nothing left to lose but I do." The [Petitioner] also testified that he told Mr. Reynolds that "the guy with the beard said that I'm a dead motherf----r" and denied ever saying "those are two dead motherf-----s over there." According to the [Petitioner], Mr. Reynolds smelled of alcohol and just stared at him before going over to join Mr. Eagan and Mr. Smith as they all stared at him. However, Mr. Reynolds testified that the [Petitioner] never asked him to call 911 and that after he split up the [Petitioner] and Mr. Eagan, neither Mr. Eagan nor Mr. Smith bothered the [Petitioner] for the rest of the night.

The [Petitioner] testified that he was not staring at Mr. Eagan, instead he was watching him so he could escape out the front door when he accidently bumped into Ms. Ravinuthala's chair. Then, according to the [Petitioner], Mr. Eagan "like a bat out of hell . . . makes a beeline straight to me and he gets up in my face" and said, "it's time for you to die." The [Petitioner] testified that this was when he drew his weapon and attempted to arrest Mr. Eagan and that as he was attempting to get Mr. Eagan on the ground, someone hit him on the back. The [Petitioner] further testified that once he was on the ground, several men began hitting him on the face and chest. He was hit on the chin with a sharp object, and the men were trying to pry his gun away from him. The [Petitioner] testified that he fired only one shot, not aiming at anyone, and that he did so only to save his life and to avoid being killed with his own gun. The [Petitioner] testified that he crawled out from underneath the pile of men and that he disarmed only after Mr. Eagan, Mr. Smith, and the 15 other men that were with them had left the bar. The [Petitioner] also testified that he told Officer Klein about the threats and that he was attempting to arrest Mr. Eagan when he was attacked.

On cross-examination, the [Petitioner] admitted that the weapon he used was not his service weapon and that it was both illegal and against department regulations for him to have his gun with him inside the Windjammer. The [Petitioner] also admitted that Mr. Eagan had nothing in his hands and had no weapon out when the [Petitioner] pulled his gun. On cross-examination, the [Petitioner] stated that the other witnesses' testimony was wrong and that he had asked Mr. Reynolds five or six times to call 911. When asked why he did not use his cell phone, the [Petitioner] stated he left it in his truck to be polite toward Mary and Ms. Lampley. When asked why he did not ask to use Mary or Ms. Lampley's cell phone, the [Petitioner] responded that he did not know if the women were "in league with these people" and perhaps they had lured him to the Windjammer to be killed. The [Petitioner] on cross[-]examination further testified that he was attempting to arrest Mr. Eagan for three counts of aggravated assault even though Mr. Eagan had not caused serious bodily injury to another and had not displayed a deadly weapon.

Id. at *1-7 (footnotes omitted).

The Petitioner filed an untimely petition for post-conviction relief. On May 20, 2016, the post-conviction court conducted a hearing on the Petitioner's claim that the statute of limitations should be tolled due to his mental incompetence. At the hearing, the

Petitioner testified that before the incident in this case, he was a sergeant with the Shelby County Sheriff's Office, working as shift commander of the Interstate 40 Drug Interdiction Unit and on the joint drug task force with the Shelby County District Attorney's Office. He had worked in law enforcement for nineteen years and did not have a criminal record. He recalled that prior to his arrest on March 14, 2008, he had never been diagnosed with a mental illness or taken any type of medication for a mental illness. Within two days of his arrest, he saw a psychiatrist and was put on medication. He recalled that he underwent a mental evaluation prior to trial, but the report was never submitted to the court. He admitted that he was never deemed incompetent to stand trial.

Asked what it is like for an officer to be incarcerated in the Shelby County Jail, the Petitioner said that "historically the Shelby County deputies and the Shelby County jailers don't get along and don't like each other." He believed this was because many of the jailers had been arrested "for bringing in narcotics into the jail and for dealing narcotics on the street." The Petitioner likened the sixteen months he spent in the Shelby County Jail to watching the first responders rush into the World Trade Center on 9/11 before the buildings fell down "knowing when it came down the horror that they died." He said that he began to suffer from mental illness during his incarceration in Shelby County. The jail psychiatrist diagnosed him with major depression and placed him on Celexa, Risperdal, Risperidone, and Wellbutrin.

The Petitioner testified that his treatment for mental health issues continued after he was convicted and transferred to the Department of Correction. He was first housed in West Tennessee State Prison. He did not recall the practitioners "who saw [him] [there] because of [his] mental state at that time," but he noted that his medical records indicated that Dr. Cole treated him. Dr. Cole diagnosed him with "post-traumatic disorder" and "severe psychosis psychotic" and increased his dosages of Risperdal, Risperidone, and Wellbutrin. The Petitioner claimed that the combined effect of his medications left him with no recollection of what occurred during his daily life in West Tennessee State Prison. He elaborated that "everyday was March 14, 2008," and the only thing he remembered doing at West Tennessee State Prison was sleeping. However, he also said that his adrenaline was high because of "the unknown if . . . the situation was fixing to escalate very quickly." He explained that it was difficult to go from "living a wonderful life" wherein he had taken "two point five billion dollars['] worth of cocaine, methamphetamine, heroin, amphetamines, [and] marijuana off the interstate I-40," to "being in a[n] eight-by-ten room twenty-four hours a day" and "need[ing] to save [his] own life." He said that he had very limited communication with his family during his time at West Tennessee State Prison.

The Petitioner testified that he was transferred to Northeast Prison, where he was additionally prescribed Lithium, Lycos, and Vistaril, and his dosage of Celexa was

increased. He said that the additional medications made him see "blacked-out figures in the corner of [his] room." The Petitioner stated that, as a former law enforcement officer, he felt that he needed to avoid other inmates for his safety. He also stayed to himself because the guards "are on a payroll of the gangs and the dope dealers and they'll turn their head in a second and not see anything if somebody is attacked." He said that he had to be "on guard twenty-four hours a day" to make sure he was not attacked, which added to his post-traumatic stress disorder. During his time at Northeast Prison, he did not read, write letters, or go to the computer lab or law library.

The Petitioner testified that he was transferred next to DeBerry Special Needs Facility, where he remains in the "honor unit." He said that upon his brother's advice in July 2012, he stopped taking all his medications and began psychotherapy. He recalled that when he first moved to DeBerry, he slept in his clothes and boots on top of his blanket to be ready in case he was attacked. He felt that the effects of the medications had gotten worse over time, and it took many months to a year for him to become functional after ceasing the medications. The Petitioner said that he has been in regular communication with his family by phone and in-person visits since being housed at DeBerry. In fact, he called his mother every day.

The Petitioner testified that he did not remember receiving a letter from his appellate counsel dated September 15, 2011. However, "because [of] [his] recollections becoming more clear after being off the medication," he recalled that his cellmate read him the letter at the time. His father also sent him a duplicate copy of the letter on March 14, 2013. The letter informed him that the Tennessee Supreme Court had issued the mandate in his case, signifying the end of the state appeals process, but it did not mention post-conviction relief. He said that another inmate told him about the ability to file a petition for post-conviction relief in December 2012, which he did after stopping his medication. He did not feel as though he was able to understand his legal rights or manage his personal affairs while taking the psychotropic medications. He surmised that if he would not be permitted to drive a vehicle while taking the medications, he should not be deemed competent to file a meaningful post-conviction petition within the statute of limitations while taking the same medications.

The Petitioner testified that, although he had stopped taking medication for a period of time, on June 13, 2015, his psychotherapist conducted a psychological test and diagnosed him with schizophrenia. His psychotherapist encouraged him to begin taking psychotropic medication "to help [him] deal with life and [his] mental health diagnosis."

After the hearing and submission of written briefs by the parties, the post-conviction court found that the Petitioner had not made a prima facie showing of incompetence to toll the statute of limitations and dismissed the petition as time-barred.

- 11 -

## ANALYSIS

The Petitioner argues that the post-conviction court erred in dismissing his petition for post-conviction relief for failure to file within the statute of limitations. He admits that he did not file a timely petition but argues that due process should toll the statute of limitations due to his mental incompetence. He challenges the post-conviction court's determination that he did not make a prima facie showing of incompetence for tolling.

Under the Post-Conviction Procedure Act, a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred." Tenn. Code Ann. § 40-30-102(a).

The post-conviction statute contains a specific anti-tolling provision:

> The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Id.

Subsection (b) of the statute sets forth the three narrow exceptions under which an untimely petition may be considered, none of which is applicable in this case. However, in addition to the statutory exceptions, our supreme court "has identified three circumstances in which due process requires tolling the post-conviction statute of limitations": (1) when a claim for relief arises after the statute of limitations has expired; (2) when a petitioner is prevented by his or her mental incompetence from complying with the statute's deadline; and (3) when attorney misconduct necessitates the tolling of the statute. Whitehead v. State, 402 S.W.3d 615, 622-23 (Tenn. 2013).

In determining whether the statute of limitations should be tolled due to a petitioner's incompetence, the question is "whether the petitioner possesses 'the present capacity to appreciate [the petitioner's] position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the

- 12 -

petitioner's capacity.'"  Reid ex rel. Martiniano v. State, 396 S.W.3d 478, 512-13 (Tenn. 2013) (quoting Tenn. Sup. Ct. R. 28, § 11(B)(1)).  "The question is not whether the [petitioner] is able to care for himself or herself, but whether the [petitioner] is able to make rational decisions concerning the management of his or her post-conviction appeals."  Reid, 396 S.W.3d at 513.

The inquiry begins with a presumption that the petitioner is competent.  Id. at 512. The petitioner must then make a prima facie showing that he or she is incompetent "by submitting affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence."  Id.  If a prima facie showing is made, the post-conviction court will then "schedule a hearing to determine whether the [petitioner] is competent to manage his [or her] petition."  Id.  At the hearing, the burden is on the petitioner to prove "that he or she is mentally incompetent by clear and convincing evidence."  Id. at 494 (citing Tenn. Code Ann. § 40-30-110(f)).

In conducting its analysis, the trial court should ask the following questions:

(1) Is the person suffering from a mental disease or defect?

(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding his legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

Id. at 513 (quoting Rumbaugh v. Procunier, 753 F.2d 395, 398-99 (5th Cir. 1985)).

A decision may be rational even when it is not one that the majority would consider acceptable, sensible, or reasonable.  A decision is rational when it is based on a process of reasoning.  A person's decision-making process is rational when that person can (1) take in and understand information; (2) process the information in accordance with his or her personal values and goals; (3) make a decision based on the information; and (4) communicate the decision.

Id. (internal citations omitted).

- 13 -

The Petitioner argues that due process requires the tolling of the statute of limitations because he was unable to manage his personal affairs or understand his legal rights due to mental health issues. He disputes the post-conviction court's finding that he was not a credible witness and argues that his medical records support his testimony that he was mentally incompetent. He asserts that he isolated himself from other inmates due to his post-traumatic stress disorder, depression, and severe anxiety, and that the various medications he was prescribed for his disorders had side effects that affected his ability to file the petition in a timely manner.

The Petitioner acknowledges that the post-conviction court specifically found his testimony not credible. The findings of fact made by the trial court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. In finding the Petitioner's testimony not credible, the post-conviction court noted that the Petitioner

> gave detailed accounts of what he did to be safe, complaining of the TDOC staff behavior concerning his stay. He constantly alternated in his testimony between describing how he was ignored and mistreated by medical staff, how the jail guards were selling drugs and taking bribes, and then would brag on himself as to being shift commander of the Interstate 40 Drug Interdiction Unit, the District Attorney's Drug Task Force, his medals for valor and life-saving and how much heroin he had stopped from coming into Memphis. He did not make a believable witness. His medical records are replete with his complaints of treatment and his constant anxiety for his safety, which do not describe a man, as he testified, that seemingly just sat in his cell and stared into space all day, heavily medicated.

The post-conviction court further noted that although the Petitioner testified that he visited with members of his family during the time period he seeks tolling, he did not present the testimony of anyone at the hearing regarding his being in a "helpless" state.

The Petitioner also argues that his mental health records support his testimony that he was unable to manage his personal affairs or understand his legal rights. However, as found by the post-conviction court, the medical records reveal that the Petitioner was malingering about his condition. In one psychiatric report submitted by the Petitioner, the examining doctor noted that the Petitioner "embellished" his condition in self-reporting a panic attack. In another psychiatric report, the examining doctor noted that the Petitioner was "clearly malingering psychosis" and had a "decreased willingness to be forthcoming and authentic." The court observed that the Petitioner's medical records

contained "numerous complaints the [P]etitioner made to medical personnel about other non-mental medical conditions he stated he was suffering and the way he was being treated . . . which evidenced clearly his awareness and ability to handle his affairs." We reiterate that "mental incompetence" does not equate with "mental illness" for tolling purposes. Terry Lamar Byrd v. State, No. 03C01-9905-CR-00199, 2000 WL 217948, at *2 (Tenn. Crim. App. Feb. 25, 2000). Rather, "[m]ental incompetence denotes the inability to manage one's personal affairs or to understand one's legal rights and circumstances." Id.

In sum, the post-conviction court determined that the Petitioner was not a credible witness and that his medical records indicated that he was feigning mental illness and unwilling to be honest about his mental health. The evidence supports the post-conviction court's finding that the Petitioner failed to establish he was unable to understand his legal rights and liabilities due to a mental illness or defect.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the dismissal of the petition.

_____
ALAN E. GLENN, JUDGE

- 15 -